# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:22-CR-175** |
| | : | |
| v. | : | (Judge Conner) |
| | : | |
| **ANDRE SIMMONS,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Defendant Andre Simmons moves to suppress the gun and other physical evidence police found during the search of a vehicle he had been driving. For the following reasons, we will deny Simmons' motion.

## I.   Factual Background[1]

On January 11, 2022, Pennsylvania State Police Corporal Scott Markley and his partner, Corporal Randy Kemmerling, were assisting the Harrisburg Bureau of Police Street Crimes Division by conducting a routine patrol of the city's uptown neighborhood in a marked police vehicle. (See 9/6/22 Tr. 3:20-5:5). The uptown neighborhood is known to law enforcement for high incidents of gun violence and drug crimes. (See id. at 16:2-7). At approximately 2:00 p.m., the troopers observed a tan Cadillac Escalade driving south on Sixth Street near the intersection of

---

[1] The following factual narrative derives from testimonial and video evidence adduced at the suppression hearing held on September 6, 2022. Citations to the suppression hearing transcript are abbreviated as "9/6/22 Tr. __." Citations to the January 11, 2022 video recording are abbreviated as "1/11/22 Rec. __." Hearing exhibits are cited as "Gov't Ex. __." This recitation of facts reflects the court's credibility determinations. Specifically, we find the testimony of Corporal Scott Markley and Corporal Randy Kemmerling to be highly credible.

Woodbine Street. (See id. at 4:1-3, 5:8-15). Andre Simmons was alone inside the vehicle. (See id. at 5:14-15). A search of the Pennsylvania Department of Transportation ("PennDOT") records database revealed the Escalade's registration plate number was assigned to a different vehicle, potentially in violation of the Pennsylvania Vehicle Code. (See id. at 5:14-17, 6:1-7, 10:15-20, 16:14-20, 51:5-18); see also 75 PA. CONS. STAT. § 1372. The troopers followed the Escalade to determine whether it had been stolen. (See 9/6/22 Tr. 5:17-18, 6:8-12, 16:21-17:13, 30:18-21).

Simmons evaded the troopers by driving at a "faster speed" (not exceeding the speed limit) and turning quickly down several side streets before pulling over and parking on Woodbine Street. (See id. at 5:16-25, 7:10-8:4). The troopers eventually caught up to the Escalade, positioned their vehicle "slightly behind" it, and attempted to query its registration plate again. (See id. at 8:5-10). They did not utilize their lights or siren. (See id. at 7:24-8:4). Meanwhile, Simmons exited the vehicle, locked it, and began walking at a fast pace toward Sixth Street. (See id. at 8:9-10, 9:6-9, 42:19-43:1, 51:19-24, 53:23-54:7, 56:20-3). He slipped on the icy sidewalk as he departed. (See id. at 9:6-9). The troopers exited their vehicle, approached Simmons, and asked him to return to the Escalade; he complied. (See id. at 8:11-13, 8:25-9:5, 9:13-25). The patrol car's motor vehicle recording ("MVR") system captured the encounter. (See Gov't Ex. 1).

Simmons wore a sweatshirt, a "full face balaclava style mask," and long pants with a keychain branded with a marijuana reference. (See 9/6/22 Tr. 10:1-10, 12:24-13:1, 55:5-12). He also held a cell phone during the stop and occasionally spoke or typed into it. (See 1/11/22 Rec. 00:01-00:11). The troopers escorted Simmons back

2

to the Escalade and asked him to reenter it to retrieve his registration and proof of insurance; Corporal Kemmerling even attempted to open the door to usher him into the driver seat, to no avail. (See 9/6/22 Tr. 13:14-19, 56:4-18, 57:15-20; 1/11/22 Rec. 00:01-00:14). They also noticed a rainbow-colored sticker emblazoned with the word "*Pothead*" on the rear of the Escalade, "seemingly . . . covering over a bullet hole," which raised their suspicions drugs might be present. (See 9/6/22 Tr. 19:5-23, 52:18-20). Simmons disclaimed ownership of the Escalade when confronted with the possible registration plate discrepancy, denied knowing where the vehicle's paperwork was kept, and refused to look for it. (See id. at 12:8-11, 13:8-25).[2] He repeatedly raised his hands in protest. (See 1/11/22 Rec. 00:09-00:17).

Corporal Kemmerling frisked Simmons for weapons but found none; during the frisk, Simmons typed something into his cell phone. (See 9/6/22 Tr. 10:11-19, 15:16-16:1, 16:2-13, 17:20-25, 52:21-25; 1/11/22 Rec. 00:15-00:40). Simmons claimed his girlfriend's mother owned the vehicle and he offered to contact his girlfriend to resolve the situation. (See 9/6/22 Tr. 52:11-17, 53:18-22). He called her with the troopers' assent, put her on speakerphone, and handed the phone to Corporal Kemmerling. (See 1/11/22 Rec. 00:27-01:45; 9/6/22 Tr. 18:1-4, 21:12-14.). After Simmons explained why he was stopped, his girlfriend indicated she "didn't have

---

[2] When asked why they insisted on Simmons getting back inside the Escalade while they "performed the stop," Corporal Markley testified he "just figured it would be more comfortable for [Simmons] to sit in his vehicle" because "[i]t was cold outside" and he thought "[i]t would be easier in general to obtain the registration and insurance if [Simmons] was in the vehicle." (9/6/22 Tr. 12:15-23). Corporal Kemmerling echoed these sentiments. (See id. at 52:21-25).

3

the information to give him over the phone," nor could she "send a message in terms of the registration and insurance." (9/6/22 Tr. 18:16-20).

Corporal Markley had returned to his patrol car by this point to complete a more thorough query of the PennDOT database. (See id. at 10:13-14). Backup officers from the Harrisburg Bureau of Police and state probation and parole agencies also began arriving on the scene, though they remained out of view. (See id. at 36:13-37:14). Corporal Markley's search revealed the registration plate affixed to the Escalade bore a number assigned to a Nissan; however, the database did not identify an expiration date or the model of the assigned vehicle.[3] (See id. at 10:13-23, 30:18-31:3). Corporal Markley explained to Simmons and his girlfriend that the registration plate number on the Escalade did not match the information in the vehicle database report. (See 1/11/22 Rec. 01:50-02:00). Corporal Markley then asked for an "insurance card, registration, or something to that effect," (id.)—essentially any paperwork "that would link [the Escalade] to the VIN" or explain "why the registration was on the wrong vehicle," (9/6/22 Tr. 12:11-12, 13:20-22, 53:11-17). Simmons presented a Pennsylvania photographic identification card and admitted he did not have a valid driver's license. (See id. at 12:12-14; 1/11/22 Rec. 02:05-02:10).

Corporal Markley ran a search using Simmons' identification card. (See 9/6/22 Tr. 14:1-9). He discovered Simmons' license was suspended and he had been

---

[3] Corporal Markley testified law enforcement commonly refers to registration plates like that on the Escalade—*viz.*, one "that has no indicators of it being valid"—as a "dead tag." (9/6/22 Tr. 10:18-23).

4

convicted of drug-related felonies but had no open warrants. (See id. at 14:9-12, 15:1-7, 55:13-21). Simmons explained the suspension was due to a 2017 drug conviction; although he could have renewed his license at some point in the intervening years, he simply failed to do so. (See 1/11/22 Rec. 04:00-04:30; 9/6/22 Tr. 21:1-4, 55:13-17). He also admitted he was on parole. (See 1/11/22 Rec. 04:57-05:03). Simmons told the troopers his girlfriend was going to call her mother for more information about the registration and insurance. (See id. at 04:30-04:40). Corporal Markley took a picture of the vehicle identification number ("VIN") on the Escalade's front windshield while Corporal Kemmerling and another police officer visually inspected the vehicle's interior through the windows, spotting an open liquor bottle. (See id. at 04:45-05:10; 9/6/22 Tr. 31:4-10). Upon returning to his vehicle, Corporal Markley indicated to a different police officer offscreen that they might need to call for a K-9 unit. (1/11/22 Rec. 05:30-05:50; see 9/6/22 Tr. 35:17-36:8).[4]

Corporal Markley ran another search using the VIN. (See 9/6/22 Tr. 30:24-31:3). He learned the VIN was assigned to the Escalade and confirmed the registration plate was on the wrong vehicle, prompting Simmons to suggest the mix-up may be attributable to repairs the Escalade recently underwent. (See 1/11/22 Rec. 06:45-07:05; see also 9/6/22 Tr. 52:13-17). He then asked Simmons for consent to search the vehicle, but Simmons wanted to wait for his girlfriend to arrive before doing anything. (See 1/11/22 Rec. 07:05-08:04). Corporal Markley

---

[4] Corporal Kemmerling continued speaking with Simmons on camera, but their conversation was not audio recorded. (See 1/11/22 Rec. 05:00-06:45).

noted the investigation would proceed without her and explained to Simmons that, as the driver, he is expected to know the vehicle's contents. (See id. at 07:21-07:30). He advised that Simmons personally could consent to the search or call someone who could consent over the phone; otherwise, the troopers would request a police K-9 unit. (See id. at 07:30-07:52). Simmons asked why a search was necessary and Corporal Markley replied he suspected "something illegal [was] in the car" based upon his training and experience because Simmons "exited the vehicle, immediately locked it, and [refused] to go back in it." (Id. at 07:52-08:07).

Simmons called his girlfriend back and told her he refused to consent to a search but the decision ultimately was hers to make. (See id. at 08:55-10:05; 9/6/22 Tr. 21:5-11). Corporal Markley asked her for permission to search the vehicle and advised her he would call for a drug-sniffing dog if she refused. (See 1/11/22 Rec. 10:05-10:35; 9/6/22 Tr. 21:12-19, 41:3-14). She would only consent to a dog sniff of the vehicle's exterior. (See 1/11/22 Rec. 10:35-11:00; 9/6/22 Tr. 21:20-23, 23:1-17, 41:15-21). As they waited for the dog to arrive, Corporal Markley asked Simmons if there was any marijuana in the Escalade. (See 1/11/22 Rec. 15:00-15:22). Simmons denied transporting drugs in the vehicle or possessing a medical marijuana card, but he volunteered his girlfriend might have one. (See id. 15:30-16:02; 9/6/22 Tr. 19:24-20:7). He also denied that anyone had smoked in the Escalade recently or that the interior would smell like marijuana, though he admitted to smoking marijuana recreationally and suggested his parole officer did not mind. (See 1/11/22 Rec. 15:50-16:02, 16:27-16:45; 9/6/22 Tr. 20:8-10). Simmons steadfastly refused to consent

6

to a search even after Corporal Markley assured Simmons he would not give him a hard time over a small amount of marijuana. (See 9/6/22 Tr. 20:11-21).

A Harrisburg police sergeant arrived a few minutes later with a drug-sniffing dog, which alerted to the odor of controlled substances outside of the Escalade. (See 1/11/22 Rec. 18:45-20:25; 9/6/22 Tr. 22:22-25, 23:18-24, 24:6-25). Corporal Markley gave Simmons the choice to consent to a search then and there or have the Escalade towed to State Police barracks, where it would be searched pursuant to a warrant; Simmons chose the latter. (See 1/11/22 Rec. 20:40-22:50; 9/6/22 Tr. 25:1-18, 43:8-20). He also admitted he smoked in the vehicle "a couple days ago." (See 1/11/22 Rec. 24:44-24:55). Corporal Markley put the same choice to Simmons' girlfriend, but her answer did not change. (See id. at 29:22-31:20; 9/6/22 Tr. 43:21-46:7). Simmons waited for the tow truck to arrive, surrendered the keys, and left the scene on foot. (See 1/11/22 Rec. 31:25-36:00; 9/6/22 Tr. 57:6-14). The troopers secured a warrant and searched the vehicle the next day. (See 9/6/22 Tr. 25:19-25, 26:17-27:9, 55:22-24). They discovered a firearm in the center console and three plastic bags containing marijuana residue in the glove compartment and on the passenger-side floorboard. (See id. at 27:17-18, 30:15-17, 47:22-48:1).

**II.     Procedural History**

A federal grand jury indicted Simmons on a single count of possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1). Simmons pled not guilty and moved to suppress the physical evidence seized from the Escalade. The court held a hearing on the suppression motion on September 6, 2022, at which

7

Corporals Markley and Kemmerling testified and the court reviewed the MVR footage. The motion is fully briefed and ripe for disposition.

### III. Discussion

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. See U.S. CONST. amend. IV; Horton v. California, 496 U.S. 128, 133 (1990). When a police officer has reasonable suspicion a crime has occurred, the officer may stop a suspect on the street for further investigation. See Terry v. Ohio, 392 U.S. 1, 30 (1968). Likewise, if the officer reasonably suspects a person has committed a traffic violation, he may stop the vehicle the person was driving and question the driver. See United States v. Green, 897 F.3d 173, 178 (3d Cir. 2018) (citing Navarette v. California, 572 U.S. 393 (2014); United States v. Delfin-Colina, 464 F.3d 392, 396-97 (3d Cir. 2006)). To justify a stop in either setting, an officer must show specific, articulable facts supporting his belief the individual broke the law. See United States v. Foster, 891 F.3d 93, 104 (3d Cir. 2018) (citing Terry, 392 U.S. at 1) (discussing general criminal activity); Delfin-Colina, 464 F.3d at 398 (discussing violations of traffic laws).

As a threshold matter, the parties dispute whether Simmons' detention should be characterized as a "traffic stop" or a "Terry stop." (See Doc. 32 at 5-6, 8; Doc. 35 at 1-2). We recognize this case lies within the liminal space between a Terry pedestrian stop and a traditional traffic stop: the troopers detained Simmons for a suspected violation of Pennsylvania's Vehicle Code moments after he exited his vehicle and started walking away. This distinction matters, the government asserts, because traffic stops are governed by a different standard, under which officers

must demonstrate additional cause to deviate from the "mission" of the stop the moment they choose to investigate non-traffic-related offenses. (See Doc. 32 at 6-7 (quoting Rodriguez v. United States, 575 U.S. 348, 356 (2015)).

The parties do not identify any case law applying the "Rodriguez moment" inquiry to pedestrian stops for suspected traffic violations. See Green, 897 F.3d at 179 (coining phrase "Rodriguez moment"). However, the Supreme Court of the United States has cautioned that a suspect may not be detained longer than necessary to complete the purpose of the stop regardless of context. Compare United States v. Sharpe, 470 U.S. 675, 685 (1985) (holding constitutionality of Terry stop is measured by purposes of stop and "time reasonably needed to effectuate those purposes"), with Rodriguez, 575 U.S. at 354 (noting permissible length of traffic stop is context-specific). We would find Simmons was lawfully detained no matter how the stop is characterized. For purposes of our analysis, we will assume Simmons' detention was a traffic stop and apply the more exacting Rodriguez standard.[5]

---

[5] We confronted an analogous scenario in our memorandum opinion of today's date in United States v. Garner, No. 1:19-CR-259, Doc. 419 (M.D. Pa. Jan. 11, 2023). In Garner, we characterized the defendant's seizure as a Terry stop rather than a traffic stop, notwithstanding his location inside a vehicle, because the purpose of the stop was to investigate potential crimes unrelated to any traffic offenses. See id. at 6 & n.2 (citing Johnson v. Campbell, 332 F.3d 199, 203, 205-06 (3d Cir. 2003) (applying Terry to investigatory stop of individual sitting in driver's seat of parked car)). Other courts have done the same in comparable circumstances, see, e.g., United States v. Mosely, 743 F.3d 1317, 1328 (10th Cir. 2014); United States v. Young, 707 F.3d 598, 602-03 (6th Cir. 2012), although we recognize these decisions arose before the Supreme Court refined its Fourth Amendment jurisprudence in the traffic context in Rodriguez. The lone fact differentiating Simmons' case from the typical traffic stop is that he exited his vehicle before the troopers could seize him to investigate a Vehicle Code violation.

To reiterate, an otherwise lawful traffic stop may violate the Fourth Amendment if police unreasonably prolong the stop. See Illinois v. Caballes, 543 U.S. 405, 407 (2005) (citing United States v. Jacobsen, 466 U.S. 109, 124 (1984)). A reviewing court must consider the "mission" of the traffic stop and any related safety concerns or incidental activities when evaluating whether officers took an unreasonable amount of time to complete it. See id. at 354-55. Generally, officers may visually inspect the vehicle's interior, see United States v. Mosley, 454 F.3d 249, 252 (3d Cir. 2006), "check[] the driver's license, determin[e] whether there are any outstanding warrants against the driver, and inspect[] the automobile's registration and proof of insurance," Rodriguez, 575 U.S. at 355 (quoting Caballes, 543 U.S. at 408). An officer also may ask "some questions relating to a driver's travel plans." See United States v. Garner, 961 F.3d 264, 271 (3d Cir. 2020) (citations omitted). Police lose the authority to continue a stop if they "divert[] from a stop's traffic-based purpose" and begin "to investigate other crimes" absent reasonable suspicion to do so. See United States v. Hurtt, 31 F.4th 152, 159 (3d Cir. 2022) (quoting Green, 897 F.3d at 179).

The Court of Appeals for the Third Circuit employs a two-step analysis to determine whether police officers violated the Fourth Amendment by needlessly prolonging a lawfully initiated traffic stop. See Green, 897 F.3d at 179. First, we

---

Cf. United States v. Gibbs, 917 F.3d 1289, 1296 (11th Cir. 2019) (investigatory detention of pedestrians standing near vehicle obstructing driving lane was traffic stop). We utilize the "Rodriguez moment" standard in these unusual circumstances so as not to exalt form over substance.

must pinpoint "when the stop was measurably extended"—*i.e.*, when the "Rodriguez moment" occurred. See id. (internal quotations marks and citations omitted). Second, we must determine whether the investigating officers possessed reasonable suspicion to extend the stop at the Rodriguez moment. See id. Events that occurred after the Rodriguez moment cannot inform our determination. See Hurtt, 31 F.4th at 159 (citing Green, 897 F.3d at 182). "'[U]nrelated inquiries' resulting in even a *de minimis* extension [of the traffic stop] are unlawful if not supported by reasonable suspicion." See id. at 160 (citing Rodriguez, 575 U.S. at 375). The purpose of this two-step inquiry is to determine "whether the mission of the traffic stop was continuously carried out before the discovery of evidence giving rise to a reasonable suspicion of criminality." See id. at 159. If investigators possessed reasonable suspicion of criminal activity at or before the Rodriguez moment, no Fourth Amendment violation has occurred. See Garner, 961 F.3d at 271.

Simmons does not contest the validity of the stop itself, and for good reason. The troopers reasonably suspected Simmons had violated the Pennsylvania Vehicle Code when they confronted him. See 75 PA. CONS. STAT. § 101 *et seq.* The Vehicle Code sets forth numerous requirements for operating a motor vehicle on the Commonwealth's roadways, several of which involve vehicle registration (or license) plates. A registration plate must "at all times . . . be securely fastened to the vehicle to which it is assigned," id. § 1332(a), and it is unlawful to "display a registration card or plate in, on or in connection with any vehicle other than the vehicle for which it was issued," id. § 1372(3). The Vehicle Code also expressly

11

empowers police officers to "seize a registration plate that appears in departmental records as . . . issued to a vehicle other than the vehicle on which it is displayed." Id. § 1334.1. Corporal Kemmerling's cursory search of PennDOT's database revealed the registration plate displayed on the Cadillac Escalade Simmons was driving had been issued to a Nissan. (9/6/22 Tr. 5:14-17, 6:1-7, 16:14-20, 51:5-18). Thus, the troopers had reasonable suspicion to initiate a traffic stop, ask Simmons about the discrepancy, and demand to see his license, registration, and proof of insurance. See United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) (citing Delaware v. Prouse, 440 U.S. 648, 663 (1979)). Simmons' retreat from the vehicle does not affect our conclusion.

Simmons claims suppression is warranted because the troopers "diverted from the ordinary business of the traffic stop immediately" by summoning him back to the Escalade and frisking him for weapons without "reasonable suspicion that [he was] armed and dangerous." (See Doc. 25 at 7 & n.1 (quoting Arizona v. Johnson, 555 U.S. 323, 332 (2009)). Alternatively, he asserts they "br[oke] from the mission of the traffic stop" by "preparing to call a K9 handler and requesting consent to search" the vehicle. (See id. at 8). We address each claim *seriatim*.

**A.    The Frisk**

Simmons begins by contesting Corporal Kemmerling's decision to frisk him within 30 seconds of their encounter, which Simmons says was without cause. (See id. at 7). We disagree. Police officers may frisk a suspect when they reasonably believe "criminal activity is afoot" and the person to be frisked "may pose a danger to" them. United States v. Lowe, 791 F.3d 424, 430 (3d Cir. 2015) (quoting Illinois

12

v. Wardlow, 528 U.S. 119, 123 (2000); Terry, 392 U.S. at 30). The officers must justify a protective frisk by pointing to specific facts giving rise to their suspicions. Details that might appear innocuous when considered separately may suffice to show criminality or dangerousness when viewed in the aggregate and through the eyes of an experienced officer. See United States v. Graves, 877 F.3d 494, 498-99 (3d Cir. 2017); United States v. Hester, 910 F.3d 78, 87 (3d Cir. 2018) (applying "an objective standard and a totality of the circumstances approach"); see also United States v. Arvizu, 534 U.S. 266, 274 (2002) (instructing courts not to engage in "divide-and-conquer analysis"). Relevant factors include the suspect's appearance and demeanor, whether he was encountered in a high-crime area, acts of insubordination or efforts to elude law enforcement, and any other behavior that "conforms to police officers' specialized knowledge of criminal activity." See United States v. Brown, 448 F.3d 239, 251 (3d Cir. 2006) (collecting cases); see also United States v. Foster, 891 F.3d 93, 105 (3d Cir. 2018); United States v. Frost, 999 F.2d 737, 741 (3d Cir. 1993).

Simmons' case bears several hallmarks of suspicious activity warranting the troopers' concern for their personal safety and brief use of precautionary measures to guard against potential danger. The stop took place in an area of Harrisburg known for high rates of drug crimes and gun violence. (See 9/6/22 Tr. 4:13-21). Simmons appeared to take evasive action in response to the troopers' presence while driving an unlawfully registered—and therefore potentially stolen—vehicle. (See id. at 7:10-23, 30:18-21). After parking, he exited the Escalade, locked it, and quickly tried to walk away. (See id. at 8:9-10, 9:6-7, 56:20-3). In his haste, he slipped

13

on the icy sidewalk. (See id. at 9:6-9). He also obscured his identity by keeping the lower half of his face covered with a balaclava-style facemask. (See id. at 12:24-13:1).

Simmons immediately denied the Escalade was his in response to basic questions concerning its ownership, which were hardly "unrelated" to the troopers' mission. See Hurtt, 31 F.4th at 160. He then refused to reenter the Escalade to retrieve registration and insurance paperwork, as required by law. (See 9/6/22 Tr. 12:8-11, 13:8-25; 1/11/22 Rec. 00:09-00:17); 75 PA. CONS. STAT. § 1311(b). The troopers identified two references to drug use on Simmons' person and vehicle: the keychain hanging from his waist and the "*Pothead*" sticker partially covering a bullet hole in the rear of the vehicle, the general contours of which are visible from a distance and conspicuous on the dashcam footage. (See 9/6/22 Tr. 19:10-23, 52:18-20, 55:5-12). And contrary to his current representations, Simmons was not "empty-handed" before the frisk, (see Doc. 25 at 7 n.1); rather, he continued holding his cell phone and typing into it—even while being patted down—perhaps alerting others to his predicament. (See 1/11/22 Rec. 00:15-00:40). The troopers reasonably surmised Simmons might be armed and dangerous under the circumstances. See Brown, 448 F.3d at 251; Foster, 891 F.3d at 105; Frost, 999 F.2d at 741. Their efforts to assuage those concerns by frisking him at the outset of the stop did not transgress the Fourth Amendment.

### B. The Dog Sniff

Simmons alternatively argues the troopers deviated from the mission of the traffic stop between the time Corporal Markley first indicated he intended to search

14

the Escalade and when he advised Simmons he would call for a drug-sniffing dog unless Simmons consented to a search. (See Doc. 25 at 8). We will assume the Rodriguez moment occurred at the earlier of the two events, approximately five minutes into the stop. (See 1/11/22 Rec. 05:00-07:30; 9/6/22 Tr. 35:17-36:8). By that point, the troopers had more than ample indicia Simmons was hiding contraband in his vehicle. In addition to the foregoing facts supporting the protective frisk, within three minutes of stopping Simmons the troopers discovered he had a criminal record including felony drug convictions, was on parole, and (admittedly) had been driving without a valid license. (See 1/11/22 Rec. 02:05-02:10); see also United States v. Henley, 941 F.3d 646, 654-55 (3d Cir. 2019) (suspect's "parole status and his criminal history with drugs made him more likely to commit a drug trafficking crime than the public") (citing Griffin v. Wisconsin, 483 U.S. 868, 879-80 (1987)).

Simmons' admission is particularly significant because driving under a suspended license is a summary offense in Pennsylvania punishable by fines and, in some instances, imprisonment. See 75 PA. CONS. STAT. § 1543. Even if the troopers had been able to settle the vehicle's ownership definitively—which they could not— they were not obliged to allow Simmons to drive away in the Escalade because they knew he could not do so lawfully. In fact, having seen him driving minutes earlier, they could have arrested him for that reason alone. See Bahgat v. Township of East Brunswick, 821 F. App'x 134, 136-37 (3d Cir. 2020) (nonprecedential) (citing Virginia v. Moore, 553 U.S. 164, 166-67 (2008) (no Fourth Amendment violation where officers reasonably determined motorist "was driving with a suspended license" in violation of state law)). The troopers' inability to confirm the Escalade's ownership,

15

combined with Simmons' evasive driving, quick retreat from the vehicle, obstinate refusal to retrieve necessary documents from it upon demand, lack of a valid license, previous convictions for drug crimes, parolee status, and the references to drug use on his person and the Escalade, provided reasonable suspicion Simmons was hiding controlled substances in the vehicle.

Lastly, to the extent Simmons suggests the troopers needlessly prolonged his detention by delaying the dog's arrival and seeking consent to search the Escalade in the meantime, (see Doc. 25 at 6-8), his assertions are unavailing. Whatever delay might have occurred is directly attributable to Simmons' own conduct and only arose after the troopers suspected he had contraband in the vehicle. Simmons frustrated the troopers' efforts to conclude their traffic-related mission by repeatedly refusing to retrieve the vehicle's registration and proof of insurance. The troopers displayed patience and flexibility by allowing Simmons to contact his girlfriend several times ostensibly to obtain digital copies of those documents. (See 9/6/22 Tr. 52:11-17, 53:18-22). Simmons then further prolonged the stop by insisting they do nothing until she arrived. (See 1/11/22 Rec. 07:05-08:04). Undeterred, the troopers diligently requisitioned a drug-sniffing dog while waiting for proof of ownership to materialize. The dog arrived a few minutes later, (see id. at 18:45-20:25)—a mere fraction of the time permitted in other dog-sniff cases, see, e.g., Frost, 999 F.2d at 742 (no lack of diligence in call for drug-sniffing dog as soon as detained suspect declined consent search of luggage, notwithstanding 80-minute wait for dog's arrival at airport); cf. Sharpe, 470 U.S. at 688 (20-minute detention of vehicle before search on suspicion of drug trafficking reasonable because police

16

acted diligently and "suspect's actions contributed to the added delay"). Simmons' suppression motion rises and falls on the validity of his investigative detention, which we find the troopers executed properly in all relevant respects. He is due no relief.

## IV. Conclusion

For the foregoing reasons, we will deny Simmons' motion to suppress. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated: January 11, 2023